1

2

3

4

5

6

7

8               **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   BYRON BROOKFIELD,                    )   Case No.: 1:11-cv-00357-AWI-JLT
                                          )
12                  Petitioner,           )   FINDINGS AND RECOMMENDATIONS TO
                                          )   DENY PETITION FOR WRIT OF HABEAS
13         v.                             )   CORPUS (Doc. 1)
                                          )
14   JAMES YATES, Warden,                 )
                                          )   ORDER DIRECTING THAT OBJECTIONS BE
15                  Respondent.           )   FILED WITHIN TWENTY-ONE DAYS
                                          )
16   ─────────────────────────────

17         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                            **PROCEDURAL HISTORY**

20         Petitioner is in custody of the California Department of Corrections and Rehabilitation

21   ("CDCR") serving an indeterminate sentence of fifteen-years-to-life pursuant to a June 3, 2005

22   judgment of the Superior Court of California, County of Kern (the "Superior Court") for discharging a

23   firearm at an inhabited dwelling house (Cal. Pen. Code § 246), and conspiracy to commit the same.

24   (Cal. Pen. Code §§ 665 & 246.)  The jury also found true separate firearm and gang enhancements.

25   (Cal. Pen. Code § § 246, 182(a); 186.22(b)(1); 12022.53.)  (Doc. 21, Lodged Documents ("LD") 5, p.

26   2).

27         The trial court sentenced Petitioner to fifteen-years-to-life for the discharge of a firearm at a

28

                                          1

dwelling and imposed a consecutive ten-year term for the firearm enhancement under § 12022.53. (LD 5, p. 17).  However, Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which, on October 12, 2006 in an unpublished decision, struck the ten-year enhancement as unauthorized under California law.  (LD 5). Petitioner then filed a petition for review in the California Supreme Court, which was granted in case no. S147980, to consider whether the gang enhancement was properly imposed in addition to the firearm enhancement.  (LD 7). On August 31, 2009, the state supreme court affirmed the 5th DCA's decision to strike the ten-year consecutive enhancement, but offered a different legal explanation for why that disposition was correct.  (LD 11).

On July 22, 2010, Petitioner filed a state habeas petition in the California Supreme Court, raising grounds two and five in the instant petition.  (LD 12).  On February 16, 2011, that petition was summarily denied.  (LD 13).

On March 2, 2011, Petitioner filed the instant petition.  (Doc. 1). Respondent's answer was filed on June 17, 2011.   (Doc. 20).  On August 3, 2011, Petitioner filed his Traverse.  (Doc. 25). Respondent does not expressly concede that all grounds for relief in the petition have been fully exhausted; however, neither does Respondent contend that any of the claims remain unexhausted. (Doc. 20, p. 11).

## **FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

On the evening of June 14, 2004, Freddie Mae Jackson attended a casual social gathering in front of an apartment complex consisting of two buildings located at 328 Monterey Street in Bakersfield. Around 8:00 p.m., she observed a small gray car pull up and park across the street from the complex, at the corner of Monterey and Inyo Streets. The vehicle was occupied by two men, the driver and a passenger. Jackson described the passenger as a young Black man. The passenger's hair was styled in an afro and he was wearing a red shirt. She did not get a good look at the driver. The occupants sat in the gray car for approximately five minutes. Ebony Johnson approached the gray car and asked its occupants "what you all want." A dark blue Ford LTD slowly drove up Monterey Street and passed the gray car.  The driver of the gray car leaned over and began firing a medium sized, black handgun. The driver was pointing

---

[1]  The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

the gun toward Jackson's sons, Casanova and Christopher, who were standing by the mailbox. Jackson heard seven or eight shots. She does not know if the passenger was armed. The gray car immediately drove away. Jackson telephoned for emergency assistance.

Bakersfield City Police Officers Jay Wells and Mike Thompson were dispatched to the scene at approximately 8:15 p.m. Nichols informed them that two people in a gray car that was parked on the north side of Inyo Street had fired a handgun at the apartment complex. Wells found two or three bullet holes in an exterior wall of the complex's west building. Nichols suggested to the officers that they look for the suspects at an apartment complex located at the intersection of Oregon and Kern Streets.

Just as the officers arrived at this location, appellant walked in front of their patrol car. Appellant matched Nichols's description of the passenger. The officers detained appellant and another man, Curtis Epperson.  Thompson found a dark blue Ford LTD parked in a nearby alley.

Jackson was transported to appellant's location. She identified appellant as the passenger in the gray car. She did not recognize Epperson.

Bakersfield City Police Officer Herman is assigned to a special enforcement unit primarily involved in criminal street gang suppression. He conducted the follow-up investigation. Herman observed bullet holes in the southwest wall of the apartment building, in a wrought iron fence and in a tree. He believes the bullet holes in the wall were recent because the stucco around the holes was not discolored.

Herman contacted Jackson and Nichols. On July 14, he showed them three photographic lineups each. Jackson identified appellant in one of the photographic lineups as an occupant of the gray car. She identified Epperson in another photographic lineup as the driver of the LTD.

It was stipulated that the Bloods were an ongoing criminal street gang operating in Bakersfield. Herman opined that appellant and Epperson were active Blood members on June 14. He further opined that the shooting was committed for the benefit of the Bloods. (Evidence pertaining to the gang enhancement will be set forth in greater detail at part II, post.)

Appellant presented an alibi defense. Al Saleh, a clerk at the Alfarooq Market located at 800 Kentucky Street, testified that appellant came into the store between 7:00 p.m. and 8:00 p.m. to purchase cigars and chips. Saleh believes appellant was in the store for a total of four to five minutes. Appellant's sister-in-law, Brandi Callahan, testified appellant was home during the day on June 14. He left the residence around 8:00 p.m. on foot, heading south on Kern Street. She believes appellant walked to the store.

(LD 5, pp. 2-4).

///

///

**DISCUSSION**

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

    (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

4

that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(per curiam).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788. Put another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the

6

federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) Batson/Wheeler error during jury selection; (2) ineffective assistance of appellate counsel; (3) Pen. Code §§ 186.22 and 12022.53 are vague and appellate counsel was ineffective for failing to inquire as to why trial counsel did not object to the statutes on vagueness grounds; (4) insufficiency of the evidence for the criminal street gang enhancement; (5) unconstitutional photographic line-up; (6) ineffective assistance of trial counsel in failing to advise Petitioner of the penal consequences of his crimes; (7) due process violation based on judicial bias in sentencing.  (Doc. 1, pp. 4-8).

A. <u>Error In Jury Selection</u>.

Petitioner first contends that he was denied his right to a fair trial because the prosecutor used peremptory challenges in a manner that violated the Equal Protection Clause, i.e., by dismissing members of Petitioner's ethnic group.  This contention is without merit.

    1. <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner contention as follows:

A. Facts

Prior to appellant's unsuccessful <u>Wheeler</u> motion, two Black prospective jury panelists were examined: prospective juror number 592213 (juror 592213) and prospective juror number 678992 (juror 678992).

Juror 592213 disclosed that she knew potential witness Mac Mosley. When asked if there was anything about her relationship with him "or [a] family relationship" that would cause her to view Mosley different than any other witness, juror 592213 replied, "I don't think so." Juror 592213 was not further examined by counsel.

Juror 678992 was a 21-year-old, unmarried student at Bakersfield College, studying to become a sportscaster. He had worked as a coach and official for a local park district. He was a life-long Bakersfield resident, residing in west Bakersfield by the fairgrounds. When asked what he thought of when he heard the term "criminal street gang," juror 678992 responded "Just, uh, bad company." He denied "ever run[ning] into any people in [his] neighborhood that are in any gangs" and he did not know any gang members. When asked what he thought of when he heard the term "law enforcement," juror 678992 responded "It's needed." He believed he could be fair and impartial and that he was a good listener.

The prosecutor exercised his third peremptory challenge to excuse juror 592213 and his fifth peremptory challenge to excuse juror 678992. After the prosecutor challenged juror 678992, appellant made a <u>Wheeler</u> motion. In support of this motion, defense counsel stated: "We believe the prosecution is systematically excluding a protected class, specifically persons, African Americans .[¶] There have been two called up so far, and both have been excused by the prosecution."

The court immediately responded that it "fully understood the prosecutor kicking off 678992." The court explained:

    "He's young, says he never saw gangs, this is where he lives, said those things.

    "Based on what he said, and how he said it, from where I sit, that young man was scared to death.

    "That young man figured that there was a life after jury duty, and there was no way that he was going to say or do anything that was going to cause him to get involved in this particular case.

    "I was struck by what he said and how he said it, and, quite frankly, I would have been disappointed at the prosecutor not to have excused him.

8

"Not because I'm favoring the prosecution or the defense, but, because, he would not, from my perspective, have been a juror who could have objectively evaluated what's going to be presented in this case."

The court found that a prima facie case had been established with respect to juror 592213 and asked the prosecutor to disclose the reason why he challenged this juror. The prosecutor responded that this juror was the former wife of Stan Mosley, who was the brother of prosecution witness Mac Mosley. The prosecutor explained: "... Stan Mosley, I can represent, as an officer of the Court, which I did not ask 592213 about, because, I was not aware, is a person who was fired under a suspicious cloud from the [Bakersfield Police Department], and also works for the defense, um, and has testified in defense cases, and has testified in defense gang cases, and, based on that information, um, I made the decision to excuse her."

The court stated: "... I did recognize 592213, and I have no reason to dispute that which [the prosecutor] has said." The court further stated "that Stan Mosley [worked at the Bakersfield Police Department] when I started on the bench, did narcotics, did all kinds of things, then he got fired from [the Bakersfield Police Department] because it was alleged that he stole a whole bunch of drugs that were in property, there were some other allegations also, then he ultimately resurfaced as an investigator...." In light of the "fact that there was the divorce, given the fact that there were all of those things going on in Stan Mosley's life, at various periods of time, I think that, probably, it was the prosecution being on the safe side in excusing her." Therefore, the court concluded the prosecution had stated a "non ethnic, non gender, non Wheeler basis for the exercise of that particular peremptory challenge."

The record does not indicate whether other members of the jury panel were Black and it does not indicate the racial composition of the jury.

B. The applicable legal standard is undisputed.

In Johnson v. California (2005) 545 U.S. 162, [125 S.Ct. 2410] (Johnson), the United States Supreme Court recently reiterated the applicable legal standard:

"First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations]. Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations .] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (Johnson, supra, 545 U.S. at p. --- [125 S.Ct. at p. 2416, fn. omitted].)

The trial court's ruling on a Wheeler motion is reviewed for substantial evidence. (People v. Jones (1998) 17 Cal.4th 279, 293.) "'"Because Wheeler motions call upon trial judges' personal observations, we view their rulings with "considerable deference" on appeal."'" [Citation.] We also bear in mind that peremptory challenges are not challenges for cause-they are peremptory. We have said that such challenges may be made on an 'apparently trivial' or 'highly speculative' basis. [Citation.]" (Id. at p. 294.)

C. Trial court's determination that a prima facie case had not been made with respect to juror 678992 was not erroneous.

Relying on the fact that juror 678992 and juror 592213 were the only Black prospective jurors examined prior to the Wheeler motion, appellant argues the trial court erred by concluding he did not make the required prima facie showing with respect to juror 678992. We disagree.

9

Observations of trial judges are given "considerable deference" on appeal. (People v. Sanders (1990) 51 Cal.3d 471, 501.) The court observed that juror 678992 appeared to be "scared to death" and it stated that the juror's answers did not appear sincere. While the record does not reflect the juror's demeanor, it does support the court's observation that some of the juror's answers did not appear sincere. Juror 678992 was a young Black male who lived by the fairgrounds in west Bakersfield. He denied ever encountering a gang member in his neighborhood. At best, this is highly unlikely. We therefore defer to the trial judge's observations concerning juror 678992.

Appellant's reliance on Johnson is misplaced. There, defendant was a Black man charged with murdering his white girlfriend's child. The prosecutor used three peremptory challenges to excuse all of the Black prospective jurors in the venire panel and an entirely white jury was chosen. After the second Black juror was challenged, the trial judge denied a Wheeler motion but stated that it was "'"very close."'" (Johnson, supra, 125 S.Ct. at p. 2414.) After the third Black juror was challenged, another Wheeler motion was made. The judge denied it, stating that the strikes could be justified because the venire members had offered equivocal or confused answers in their written questionnaires. The United States Supreme Court reversed the judgment, concluding that California's "'more likely than not'" (Johnson at p. 2419) standard for determining whether a prima facie case of discrimination had been established was too onerous. In contrast, here, the charged offense did not involve a highly charged racial situation and racial compositions of the venire panel and of the jury are not part of the appellate record. Furthermore, the judge articulated a specific, nondiscriminatory justification for the challenge of juror 678992-i.e., it was apparent that he was terrified and had not sincerely responded to the venire questions. Thus, Johnson is factually distinguishable.

Several California cases are relevant. In People v. Turner (1994) 8 Cal.4th 137, counsel's statement that all of the prospective jurors were Black and either had indicated that they could be fair and impartial or in fact favored the prosecution was deemed insufficient to establish a prima facie case. (Id. at p. 167.) And in People v. Davenport (1995) 11 Cal.4th 1171, counsel's statement that the prosecutor had used three of his first six peremptory challenges to excuse jurors with Hispanic surnames was deemed insufficient. (Id. at p. 1201.) Finally, in People v. Rousseau (1982) 129 Cal.App.3d 526, the prosecutor exercised peremptory challenges to excuse the only two Blacks in the jury panel. Defense counsel made a Wheeler motion on this basis. The trial court concluded a prima facie case had not been established and this determination was upheld on appeal. (Id. at p. 537.)

Accordingly, we agree with the trial court that appellant failed to make a prima facie showing that the totality of the circumstances gave rise to a reasonable inference of discrimination with respect to juror 678992.

Since the burden did not shift to the prosecutor with respect to juror 678992, we summarily reject appellant's complaint concerning the court's failure to ask the prosecutor why he challenged this juror. (People v. Howard (1992 1 Cal.4th 1132, 1157 [no explanation necessary absent finding of prima facie case of group bias].)

D. The prosecutor's reason for challenging juror 592213 was valid and nondiscriminatory.

Appellant also challenges the sufficiency of the prosecutor's explanation why he challenged juror 592213, arguing that another prospective juror indicated that he knew a potential witness and the prosecutor did not excuse this juror. This argument fails because it is premised on a misunderstanding of the prosecutor's explanation. The prosecutor did not challenge juror 592213 because she knew a potential witness. He challenged juror 592213 because he was concerned that she would be biased against the prosecution since her ex-husband, Stan Mosley, had been fired by the Bakersfield Police Department and subsequently worked as a defense

10

investigator. Bakersfield police officers were key prosecution witnesses in this matter. Obviously, the prosecutor did not want to run the risk of retaining a juror who might harbor animosity against the Bakersfield Police Department. The trial court stated that it remembered the circumstances of Stan Mosley's dismissal. The prosecutor's reason for challenging juror 592213 was reasonable, valid and race neutral.

(LD 5, pp. 4-10).

        2.  Federal Standard.

In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race. People v. Wheeler, 22 Cal.3d 148 (1978), is the California state counterpart to Batson. Yee v. Duncan, 463 F.3d 893, 896 (9th Cir.2006). However, it is the standard set out in Batson that control the disposition of Petitioner's claim on federal habeas corpus review. Lewis v. Lewis, 321 F.3d 824, 827 (9th Cir.2003).

In order to prevail on a Batson claim, a defendant must first establish a prima facie case of purposeful discrimination. Batson, 476 U.S. at 96–97; Lewis, 321 F.3d at 830; United States v. DeGross, 960 F.2d 1433, 1442 (9th Cir.1992). "To establish a prima facie case, the defendant must show that 'he is a member of a cognizable racial group,' Batson, 476 U.S. at 96, and that 'the facts and circumstances of the case raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race." McClain v. Prunty, 217 F.3d 1209, 1219–20 (9th Cir.2000) (quoting Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir.2000)). In deciding whether a defendant has made the requisite showing, the trial court should consider all relevant circumstances. Batson, 476 U.S. at 96.

If a prima facie case is made out, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors in question. Batson, 476 U.S. at 97; DeGross, 960 F.2d at 1442; Stubbs, 189 F.3d at 1104. "The prosecution's challenges need not rise to the level justifying use of a challenge for cause." United States v. Power, 881 F.2d 733, 740 (9th Cir.1989) (citing Batson, 476 U.S. at 87–98). For the purposes of this step, however, the prosecutor's explanation need not be "persuasive or even plausible." Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, a neutral explanation in this context "means an explanation based on something other

than the race of the juror." McClain, 217 F.3d at 1220 (quoting Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." McClain, 217 F.3d at 1220 (quoting Stubbs, 189 F.3d at 1105). As with any credibility determination, the trial court's own observations are of significant importance. Batson, 476 U.S. at 98, n. 21. See also Lewis, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359). See also Batson, 476 U.S. at 98. The Court must evaluate the prosecutor's reasons and make a credibility determination. Lewis, 321 F.3d at 830. A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination." Lewis, 321 F.3d at 830. If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext. Id. The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extent that a court should sustain a Batson challenge. Id. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir.1989)). "Excluding jurors because of their profession, or because they were acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative." United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir.1987). "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor." Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir.1987).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, Batson, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent of the

strike." Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). However, Petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559 662, 73 S.Ct. 891 (1953)).

          3.  Analysis.

As to juror 678992, the California Court of Appeal noted that the state trial court deferred to the trial judge's observations regarding the demeanor of this potential juror and, in the 5th DCA's words, concluded that he "was terrified and had not sincerely responded to the venire questions." Accordingly, the state court found that Petitioner had failed to meet his initial burden of showing a discriminatory intent in the prosecution's exercise of a peremptory challenge to this prospective juror. This conclusion appears to be supported by the record.

As to juror 592213, the 5th DCA, apparently assuming for the sake of argument that a prima facie case had been made, shifted the burden to the prosecution, but ultimately found that the prosecution's proffered reason was reasonable, valid, and race neutral.  The prosecution had indicated during the Batson/Wheeler hearing that the potential juror was the ex-wife of a former Bakersfield Police Department officer who was fired for stealing drugs, and, therefore, that she might reasonably harbor prejudice against the Bakersfield Police Department, whose officers were crucial witnesses in the case.  The state court emphasized that juror 592213 was not excused merely because she knew a potential witness, i.e., the brother of her ex-husband.

On this record, Petitioner has failed to meet the burden of demonstrating that the state appellate court's disposition of Petitioner's claim was contrary to or an unreasonable application of clearly established federal law. Nor has Petitioner demonstrated that the state appellate court's decision was an unreasonable application of the facts in light of the evidence presented in the state court proceeding. The conclusions by the state appellate court that Petitioner had failed to make a prima facie showing with respect to juror 678992, and that the prosecution had proffered a reasonable race-neutral explanation for excusing juror 592213, were both supported by the record and the result of applying

the correct federal rule. Under those circumstances, the state court's conclusions regarding these two prospective jurors were not objectively unreasonable.

      B.  <u>Ineffective Assistance of Appellate Counsel</u>.

      Petitioner next maintains that he was denied his Sixth Amendment right to effective assistance of appellate counsel.  Petitioner's complaint is that appellate counsel failed, despite repeated urging by Petitioner, to "find out why trial counsel did not investigate why the entire jury pool underrepresented African Americans and other minorities in relation to those in the county, & surrounding communities which I know to have a substantial number of qualified African Americans and other minorities." (Doc. 1, p. 4).  Again, the Court disagrees.

      1.  <u>State Court Adjudication</u>.

      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir.2008); <u>see also Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir.2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

      As mentioned, the court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir.2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir.2007). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784–85, 178 L.Ed.2d 624 (2011). This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id</u>. at 785 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803, 111 S.Ct. 2590 (1991)).

14

Where, as is the case with this claim, the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). In such circumstances, a reviewing court can still apply the "objectively reasonable" standard of Williams to the state court decision. However, "[i]ndependent review of the record is not de novo review of the constitutional issue," Himes, 336 F.3d at 853, but rather, "an independent review of the record…to determine whether the state court clearly erred in its application of controlling federal law." Thomas v. Hubbard, 273 F.3d 1164, 1170 (9th Cir. 2001); Bailey, 263 F.3d at 1028; Delgado, 223 F.3d at 982. Under independent review, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784.

2. Federal Law On Effective Assistance Of Counsel.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for

counsel's unprofessional errors, he would have prevailed on appeal. <u>Id</u>. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. <u>Id</u>. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir.1998).

In challenges to the effective assistance of appellate counsel, the same standards apply as with the claims of ineffective assistance of trial counsel. <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000); <u>Smith v. Murray</u>, 477 U.S. 527 (1986).   In <u>Smith</u>, the United States Supreme Court indicated that an appellate attorney filing a merits brief need not and should not raise every non-frivolous claim. <u>Robbins</u>, 528 U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal.  <u>Id</u>.  As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable.  <u>Gustave v. United States</u>, 627 F.2d 901, 906 (9th Cir. 1980); <u>see also Gillhan v. Rodriguez</u>, 551 F.2d 1182 (10th Cir. 1977).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.  <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Here, the state court identified the appropriate federal standard by applying <u>Strickland</u>.[2]  Thus, the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was neither deficient nor prejudicial, was not contrary to or an unreasonable application of <u>Strickland</u>.  For the reasons discussed below, the Court concludes that it was not.

        3.  <u>Analysis</u>.

Petitioner's contention is that appellate counsel should have investigated why trial counsel did not look into the purported "underrepresentation" of African Americans and other minorities in the jury pool.  However, Petitioner has provided no proof whatsoever that African Americans or any other minorities were underrepresented in the jury pool from which his jury was selected.  Indeed, as the 5th DCA pointed out, there is no evidence at all in the record regarding even the racial or ethnic composition of the jury itself, much less of the jury pool in relation to the wider ethnic and racial composition of the community from which it was drawn.  (LD 5, p. 6).

Second, and perhaps most obviously, the Court has already rejected Petitioner's claim that his constitutional rights were violated by the manner in which the jury was selected.  That being the case, it is difficult to see the legal relevance of having appellate counsel "find out why trial counsel did not investigate" this matter more fully.  Presumably, Petitioner is contending that, had appellate counsel conducted such an investigation, grounds for an ineffective assistance claim against his trial counsel could have been developed during the direct appeal.  However, even had appellate counsel done as Petitioner urged and asked trial counsel, what trial counsel might have said and whether the response would have provided a basis for an ineffective assistance claim is mere speculation at this juncture.  While the composition of the jury pool may have seemed to Petitioner to vary from his perception of the racial composition of the larger community, a federal habeas claim cannot be premised on a petitioner's "feelings" or his "sense" that something may or may not be true.  Evidence is required, and evidence is entirely absent here.  Moreover, the random method under which the jury pool is compiled does not guarantee that, in every trial, the racial composition of the jury pool will precisely mirror the racial composition of the larger community

---

[2]The 5th DCA cited <u>Williams v. Taylor,</u> 529 U.S. at 390-391, which, in turn, refers to <u>Strickland</u>.

In sum, Petitioner has failed to show that his appellate counsel's performance was deficient in any respect.  Accordingly, the state court adjudication rejecting Petitioner's claim was not objectively unreasonable.

C.  Vagueness Challenge To Petitioner's Sentence.

Petitioner next contends that his sentence was unlawful because both Pen. Code § § 12022.52 and 186.22 are unconstitutionally vague.  Petitioner also contends that his appellate counsel was ineffective for failing to inquire as to why trial counsel did not challenge the constitutionality of the statutes.  This contention also lacks merit.

1.  The California Supreme Court's Opinion.

The California Supreme Court rejected Petitioner's claim regarding the constitutionality of the statutes as follows:

> The threshold inquiry we need to answer is this: When a defendant is sentenced to a life term for the felony of shooting at an inhabited dwelling (§ 246) because the defendant committed that crime to benefit a criminal street gang (§ 186.22, subd. (b)(4)(B)), is that offense a "felony punishable by ... imprisonment in the state prison for life" within the meaning of subdivision (a)(17) of section 12022.53, thereby triggering the 10–year additional punishment under subdivisions (b) and (e)(1) of section 12022.53 for personal use of a firearm by a principal in the offense? As we explain in the companion case of People v. Jones, supra, 47 Cal.4th 566, 98 Cal.Rptr.3d 546, 213 P.3d 997, the answer to this question is "yes." Our reasoning follows.
>
> Shooting at an inhabited dwelling (§ 246) is, by itself, punishable by a term of three, five, or seven years in prison, at the trial court's discretion. But when that crime is committed to benefit a criminal street gang, as the jury here found, the penalty is life imprisonment, with a minimum term of no less than 15 years. (§ 186.22(b)(4).) As the companion case of People v. Jones, supra, 47 Cal.4th at p. 576, 98 Cal.Rptr.3d at p. 553, 213 P.3d at p. 1003 holds, that life term does not (contrary to the Court of Appeal's conclusion in this case) constitute a sentence enhancement, because it is not imposed in addition to the sentence for the underlying crime (here, shooting at an inhabited dwelling); rather, it is an alternate penalty for that offense. Because the felony that defendant committed (shooting at an inhabited dwelling) was punishable by a life term under section 186.22(b)(4) (because it was committed to benefit a criminal street gang), he committed a "felony punishable by ... imprisonment in the state prison for life" within the meaning of subdivision (a)(17) of section 12022.53. Both defendant and the Attorney General agree on this.
>
> They disagree, however, on the effect of section 12022.53(e)(2), which states: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."
>
> According to the Attorney General, section 12022.53(e)(2) does not limit defendant's sentence in this case. Section 186.22, the Attorney General explains, contains not only sentence enhancements—added terms of two, three, or four years (§ 186.22, subd. (b)(1)(A)); five years

18

(§ 186.22, subd. (b)(1)(B)); or 10 years (§ 186.22, subd. (b)(1)(C))—but also penalty provisions. The latter are the life sentence under section 186.22(b)(4), which applies here, and two others described in subdivisions (b)(5) and (d) of section 186.22. Noting that section 12022.53(e)(2), by its terms, precludes the imposition of "[a]n enhancement for participation in a criminal street gang" (italics added) in addition to an increased penalty imposed under section 12022.53, the Attorney General argues that section 12022.53(e)(2) does not prohibit imposition of a life term under section 186.22(b)(4) in addition to a sentence enhancement under section 12022.53 (as occurred in this case), because the life term is not a sentence "enhancement" but an alternate penalty for the underlying crime of shooting at an inhabited dwelling, which, by itself, is punishable by a prison term of three, five, or seven years, at the trial court's discretion.

Defendant disagrees. He argues that the term "enhancement," as used in section 12022.53(e)(2), encompasses not only an additional prison term but also any greater term of imprisonment (such as a penalty provision) that is imposed because the underlying crime was committed to benefit a criminal street gang. Under this statutory construction, when (as here) a trier of fact finds to be true an allegation justifying imposition of a life term under section 186.22(b)(4)'s penalty provision based on street gang participation, and finds to be true a sentence enhancement allegation under section 12022.53 for firearm use, and when (as here) section 12022.53's sentence enhancement applies because a principal other than the defendant used a firearm in committing the offense, the trial court may not impose the sentence enhancement under section 12022.53 in addition to a life term under section 186.22(b)(4). As explained below, we agree with defendant.

"In construing a statute, our role is to ascertain the Legislatures intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we must look first to the words of the statute because they are the most reliable indicator of legislative intent. [Citation.]" (People v. Lopez (2003) 31 Cal.4th 1051, 1056, 6 Cal.Rptr.3d 432, 79 P.3d 548.) "We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute ... to determine the scope and purpose of the provision.... [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute...." ' " (People v. Murphy (2001) 25 Cal.4th 136, 142, 105 Cal.Rptr.2d 387, 19 P.3d 1129.)

With these principles in mind, we examine section 12022.53(e)(2). We acknowledge that decisions of this court in the last decade have, in construing various subdivisions of section 186.22 (the primary section referred to by the word "enhancement" in section 12022.53(e)(2)), drawn a distinction between penalty provisions and sentence enhancements in that section; these decisions have construed the word "enhancement" as meaning an additional term of imprisonment, explaining that a penalty provision is not a sentence enhancement because the former provides an alternate penalty rather than an additional punishment. (See People v. Briceno (2004) 34 Cal.4th 451, 460, fn. 7, 20 Cal.Rptr.3d 418, 99 P.3d 1007 [characterizing various subdivisions of section 186.22 as either enhancements or penalty provisions]; Robert L. v. Superior Court (2003) 30 Cal.4th 894, 899, 135 Cal.Rptr.2d 30, 69 P.3d 951 [section 186.22's subdivision (d), which provides that any public offense punishable as a felony or a misdemeanor is punishable by one, two, or three years in prison when committed to benefit punishable by one, two, or three years in prison when committed to benefit a criminal street gang, is a penalty provision, not a sentence enhancement]; People v. Jefferson (1999) 21 Cal.4th 86, 101, 86 Cal.Rptr.2d 893, 980 P.2d 441 [§ 186.22, subd. (b)(4) is a penalty provision, not a sentence enhancement]; see also People v. Acosta (2002) 29 Cal.4th 105, 118, 124 Cal.Rptr.2d 435, 52 P.3d 624 [25–year minimum prison term described in § 667.61 is a penalty provision, not a sentence enhancement]; People v. Murphy, supra, 25 Cal.4th at p. 154, 105 Cal.Rptr.2d 387, 19 P.3d 1129 [punishment described in § 666 is a penalty provision, not a sentence enhancement].) The Attorney General urges us to give the word "enhancement" in

19

section 12022.53(e)(2) this same meaning.

If the cases cited in the preceding paragraph had already been decided when the Legislature enacted section 12022.53, it would be reasonable to infer that the Legislature was aware of the distinction this court has drawn between the sentence enhancements and the penalty provisions set forth in section 186.22, and that the Legislature intended the word "enhancement" in the statute to have the narrow meaning articulated by this court. That narrow meaning is this: The word "enhancement" refers only to a sentence enhancement, not a penalty provision. But the cases in question were decided after the Legislature's enactment of section 12022.53 in 1997.5 Thus, the Legislature did not have the benefit of this court's later decisions that have given the term "enhancement" the narrow meaning that the Attorney General argues we should apply to that term in section 12022.53(e)(2).

It appears that the Legislature's use of the term "enhancement" in section 12022.53(e)(2) was intended to refer broadly to any greater term of imprisonment for a crime that, as here, is committed to benefit a criminal street gang. This means that, as used in the statute, the word "enhancement" includes not only the sentence enhancements in section 186.22, but also the alternate penalty provisions in that section. Our reasons follow.

Section 12022.53's sentencing scheme distinguishes between four types of offenders. The first group consists of those offenders who personally used or discharged a firearm in committing a gang-related offense that is specified in section 12022.53. These defendants are subject to both to the harsh enhancement provisions of 12022.53 and the gang-related sentence increases of section 186.22. The second group consists of accomplices to a gang-related offense specified in section 12022.53 in which, as here, not the defendant but another principal personally used or discharges a firearm. They are subject to additional punishment under either section 12022.53 or the gang-related sentence increases under section 186.22, but not both. The third group consists of those who personally used or discharged a firearm during an offense that is specified in section 12022.53 but is not gang related. They are subject to additional punishment under section 12022.53, but because the crime is not gang related, the gang-related sentence increases of section 186.22 do not apply. The fourth group consists of those who committed a crime that is listed in section 12022.53 but is not gang related, and who did not personally use or discharge a firearm. This last group of defendants is not subject either to the gang-related sentence increases of section 186.22 (because the crime was not gang related) or to the additional punishment provisions of section 12022.53 (because the offender did not personally use or discharge a firearm).

The Attorney General's argument here that we should construe the term "enhancement" in section 12022.53(e)(2) as meaning an "additional term of imprisonment"—the narrow, technical meaning generally used in this court's past decisions—would partially nullify, in some cases, the distinction that the Legislature sought to draw between the first two of the four groups of offenders described in the preceding paragraph: those who personally used firearms in gang-related felonies, and those who were merely accomplices to such offenses. To accept the Attorney General's statutory interpretation would have the following effect: A defendant who in a gang-related offense personally used or discharged a firearm would be punished more harshly than an accomplice to such an offense in cases in which an increased sentence is imposed under a sentence enhancement provision of section 186.22; but when an increased sentence is imposed under a penalty provision of section 186.22, the perpetrator who personally used or discharged the gun and the accomplice who did not do so would receive equally severe penalties. To allow such a result would be inconsistent with the Legislature's apparent goal, in section 12022.53's subdivision (e), of reserving the most severe sentences for those who personally used or discharged a firearm in the commission of a gang-related crime.

Unlike the Attorney General's interpretation, defendant's construction of the word

20

"enhancement" in section 12022.53(e)(2) is consistent with the Legislative purpose described above. Under defendant's statutory interpretation, a defendant who personally used or discharged a firearm in a gang-related felony specified in section 12022.53 will be subject to greater punishment for both gang participation under section 186.22 and firearm use under section 12022.53, but an accomplice who, as defendant here, did not personally use or discharge a firearm would be subject to an increased sentence under only one of those two statutes.

Nothing in this opinion should be read as undermining the validity of the strict distinction this court has drawn in the past between sentence enhancements and penalty provisions in other contexts. (See People v. Briceno, supra, 34 Cal.4th at p. 460, fn. 7, 20 Cal.Rptr.3d 418, 99 P.3d 1007; Robert L. v. Superior Court, supra, 30 Cal.4th at p. 899, 135 Cal.Rptr.2d 30, 69 P.3d 951; People v. Acosta, supra, 29 Cal.4th at p. 118, 124 Cal.Rptr.2d 435, 52 P.3d 624; People v. Murphy, supra, 25 Cal.4th at p. 154, 105 Cal.Rptr.2d 387, 19 P.3d 1129; People v. Jefferson, supra, 21 Cal.4th at p. 101, 86 Cal.Rptr.2d 893, 980 P.2d 441.) This is a distinction that the Legislature may want to consider in any future legislation on the subject.

For the reasons described above, we conclude that the word "enhancement" in section 12022.53(e)(2) refers to both the sentence enhancements in section 186.22 and the penalty provisions in that statute. Thus, that provision barred the trial court here from imposing both the penalty of a life term under section 186.22(b)(4) and the 10–year sentence enhancement under subdivisions (b) and (e)(1) of section 12022.53. Which of the two should the court have imposed? According to defendant, only the 10–year sentence enhancement. Defendant relies on the language in section 12022.53(e)(2) stating that enhancements for street gang participation "shall not be imposed ... in addition to an enhancement imposed pursuant to this subdivision, unless the [defendant] personally used or personally discharged a firearm in the commission of the offense." (Italics added.) Relying on the italicized words in the statutory language just quoted, defendant argues that a trial court should impose only the applicable sentence enhancement under section 12022.53 (here the 10–year enhancement under § 12022.53, subds. (b) and (e)(1)) when, as here, a defendant does not personally use or discharge a firearm; to impose "in addition to" that sentence enhancement, the life sentence called for under section 186.22(b)(4) would, according to defendant, be improper. We disagree.

Defendant's proposed interpretation of the words would give him an unjust windfall, as explained below. If the jury had found only that defendant had committed the crime of shooting at an inhabited dwelling (§ 246) to benefit a criminal street gang (§ 186.22), and nothing else, he would be subject to the penalty of a life term under section 186.22(b)(4). But under defendant's reasoning, the jury's additional finding of firearm use would, under the "in addition to" language of section 12022.53(e)(2), preclude imposition of the life term set forth in section 186.22(b)(4), permitting imposition of only the 10–year additional punishment set forth in section 12022.53's subdivisions (b) and (e)(1). This result would be contrary to the Legislature's declared purpose in enacting section 12022.53: to impose "substantially longer prison sentences ... on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." (Legislative finding, Stats.1997, ch. 503, § 1 [uncodified provision], italics added.)

Moreover, defendant's statutory construction would be inconsistent with section 12022.53's subdivision (j). That provision states in part: "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment." (Italics added.) Thus, consistent with that statutory provision, the trial court here should have imposed the greater penalty (the life term under section 186.22(b)(4)), rather

than the lesser punishment (the 10–year sentence enhancement under section 12022.53's subdivisions (b) and (e)(1)).

Defendant concedes that his reading of section 12022.53(e)(2) would make that provision inconsistent with subdivision (j) of the same statute, which we quoted in the preceding paragraph. To resolve this alleged inconsistency between the two subdivisions, defendant asserts, we should ignore subdivision (j), which is the more general provision, and apply only subdivision (e)(2), the more specific provision. Doing so, defendant argues, would be consistent with the rule that "particular or specific provisions will generally take precedence over conflicting general provisions" (People v. Campbell (1995) 40 Cal.App.4th 1666, 1672, fn. 6, 48 Cal.Rptr.2d 340).

But the two subdivisions just mentioned would be in conflict only if we were to accept defendant's interpretation of the phrase "in addition to" in section 12022.53(e)(2). More persuasive is the Attorney General's interpretation of that phrase. This is why: (1) the Attorney General's interpretation is consistent with the objective of section 12022.53, which was to impose longer punishment for those committing felonies involving firearm use (see 98 Cal.Rptr. at p. 545, 213 P.3d at pp. 996–997, ante); and (2) as explained below, under the Attorney General's interpretation there is no conflict between subdivisions (e)(2) and (j) of section 12022.53. As construed by the Attorney General, the phrase "in addition to" in section 12022.53(e)(2) does not require the trial court to select a sentence enhancement under section 12022.53 over a sentence enhancement or a penalty provision that is set forth in section 186.22 if application of the latter would result in a greater punishment; what the trial court cannot do is to impose punishment under both section 186.22 and section 12022.53. In choosing which of those two provisions to apply, the trial court must, consistent with section 12022.53's subdivision (j), choose the provision that will result in a greater sentence. In this case, the greater penalty would be the life term under the alternate penalty provision in section 186.22(b)(4), not the 10–year sentence enhancement provided for in subdivisions (b) and (e)(1) of section 12022.53.

(LD 11, pp. 7-16).[3]

### 2. Federal Law.

The test for vagueness is whether the statute fails "to give a person of ordinary intelligence fair notice that it would apply to the conduct contemplated." United States v. Rearden, 349 F.3d 608, 614 (9th Cir. 2003); Melugin v. Hames, 38 F.3d 1478 (9th Cir. 1994); see also Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688 (1971). "To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 2927–28 (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855 (1983)); United States v. Kilbride, 584 F.3d 1240, 1256–57 (9th Cir.2009) (even under heightened standards of clarity for statutes involving criminal sanctions,

---

[3] The decision is published at People v. Brookfield, 47 Cal.4th 583 (2009).

"due process does not require impossible standards of clarity," quoting <u>Kolender v. Lawson</u>, 461 U.S. at 361); <u>see also Maynard v. Cartwright</u>, 486 U.S. 356, 361, 108 S.Ct. 1853 (1988) ( "Objections to vagueness under the Due Process Clause rest on lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."). When determining if a statute is vague, a court should look at the common understanding of the statute's terms. <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 608, 93 S.Ct. 2908 (1973); <u>United States v. Fitzgerald</u>, 882 F.2d 397, 398 (9th Cir. 1989).

In addition, a statute must establish "minimal guidelines for law enforcement" and not grant law enforcement undue discretion.   <u>Kolender</u>, 461 U.S. at 358; <u>United States v. Sorenson</u>, 914 F.2d 173, 174 (9th Cir. 1990); <u>United States v. Van Hawkins</u>, 899 F.2d 852, 854 (9th Cir. 1990).  "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." <u>Kolender</u>, 461 U.S. at 358 (citation, quotations and brackets omitted).

Finally, alleged vagueness should be judged in light of the conduct involved. <u>See, e.g., United States v. Powell</u>, 423 U.S. 87, 92–93, 96 S.Ct. 316 (1975).  Unless First Amendment freedoms are implicated, "a vagueness challenge may not rest on arguments that the law is vague in its hypothetical applications, but must show that the law is vague as applied to the facts of the case at hand."  <u>United States v. Johnson</u>, 130 F.3d 1352, 1354 (9th 1997); <u>Fitzgerald</u>, 992 F.2d at 398.

3.  <u>Analysis</u>.

Petitioner's constitutional argument regarding the sentencing provisions applied to his case appear to be a work in progress.  In his petition, Petitioner alleges that the state trial court "misapplied" § 186.22 and § 12022.53 "contrary to legislative intent" and as a result of judicial bias. (Doc. 1, p. 5).  In his Traverse, Petitioner argues a somewhat different position, i.e., that the two statutes themselves are so confusing that even the lawyers in the case, the trial judge, and the Court of Appeal had difficulty determining Petitioner's actual sentence.  (Doc. 25, p. 24).

First, the Court agrees with Respondent's contention that Petitioner's challenge to sentencing, as presented to the California Supreme Court and exhausted therein, does not present a federal

question.  Petitioner presented this issue to the state high court in his direct review through a Petition for Review.  (LD 6).  However, the issue, as presented in the Petition for Review, does not raise any federal constitutional issue regarding Petitioner's sentencing nor does Petitioner cite any federal case or statute regarding that argument.  (LD 6, pp. 16-18).  The California Supreme Court granted review as to the limited question whether "a violation of Penal Code section 246 (shooting at an inhabited dwelling) that is committed to benefit a criminal street gang [citations] is a 'felony punishable by…imprisonment in the state prison for life" [citations] such that the sentence for the violation may be enhanced under subdivisions (b) and (e) of Penal Code section 12022.53 for a principal's personal use of a firearm. [Citations]."  (LD 6, Attachment, Order of February 7, 2007).

Thus, the only exhausted sentencing issue relates to whether, under California law, Petitioner's sentence can be enhanced in the manner described above.  Because that issue does not implicate any federal constitutional rights but instead involves only a State's interpretation and application of its own laws, the claim fails to raise a cognizable federal habeas claim.

Issues of state law sentencing errors generally are not cognizable on federal habeas review, unless the petitioner claims a deprivation of due process or equal protection due to the misapplication of the sentencing law. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993), cert. denied, 115 S.Ct 290 (1994); Featherstone v. Estelle, 948 F.2d 1497, 1500 (9th Cir. 1991); Estelle v. McGuire, 112 S. Ct. 475, 480 (1991) (holding that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); Miller v. Vasquez, 868 F. 2d 1116, 1118-19 (9th Cir. 1989) (refusing to address sentence enhancement claim).  Moreover, "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 29 (9th Cir.1994).

A criminal defendant is entitled to due process at sentencing. Gardner v. Florida, 430 U.S. 349, 358, 979 S. Ct. 1197 (1977). Federal courts must defer to a state court's interpretation of state sentencing laws. Bueno v. Hallahan, 998 F. 2d 86, 88 (9th Cir. 1993). "Absent a showing of fundamental unfairness," a state court's misapplication of its own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F. 3d 461, 469 (9th Cir. 1994). As a threshold matter, the

24

1    court must determine whether Petitioner has alleged that his sentence is fundamentally unfair.

2         A showing of fundamental unfairness has been found under two circumstances. First, where a

3    state court imposed a sentence in excess of state law.  Walker v. Endell, 850 F. 2d 470, 476 (9th Cir.

4    19970; see also, Marzano v. Kincheloe, 915 F.2d 549, 552 (9th Cir. 1990) (guilty plea does not permit

5    state court to impose a sentence in excess of state law despite agreement of defendant to sentence).

6    Second, where a state court enhanced a sentence based on materially false or unreliable information or

7    based on a conviction infected by constitutional error. See United States v. Hanna, 49 F.3d 572, 577

8    (9th Cir. 1995); Walker, 850 F. 2d at 477. Generally, a federal habeas court will not review a state

9    sentence that is within statutory limits. Id. at 476.

10        Here, Petitioner does not expressly contend that the state court's interpretation of its sentencing

11   laws was "fundamentally unfair."  However, the petition does contend that the state court misapplied

12   §§ 186.22 and 12022.53.  (Doc. 1, p. 5).  Also, Petitioner goes on to complain that the state court's

13   interpretation and application of those two statutes was "irrational."  (Id.).  In the Court's view, such

14   allegations are sufficient for the Court to conclude that, as a threshold matter, Petitioner has indeed

15   alleged that the state court's application of its sentencing laws was fundamentally unfair.

16        However, Petitioner has failed to show that his allegation of fundamental unfairness is actually

17   borne out by a review of the record.  That is, Petitioner has failed to show that either state court

18   imposed a sentence in excess of state law, Walker v. Endell, 850 F. 2d at 476, or that his sentence was

19   enhanced based on materially false or unreliable information or based on a conviction infected by

20   constitutional error. See United States v. Hanna, 49 F.3d at 577.  The petition does not allege that

21   Petitioner was sentenced of state law or that false or unreliable information was the basis for the

22   enhancement.  Rather, Petitioner contends that the statue is vague and confusing.  This is a criticism

23   that may be aimed at many criminal sentencing laws; however, it is neither a legal basis for

24   challenging those laws, nor a basis for habeas relief.  However, even assuming, arguendo, that

25   Petitioner's claim does raise a federal habeas issue, it is without merit for the reasons set forth below.

26              a.  Section 186.22.

27        To the extent that Petitioner is contending that the definition of a criminal street gang is vague

28

25

and overbroad, he is mistaken.  Under California law, § 186.22 defines a criminal street gang as:  (1) an ongoing association of three or more persons sharing a common name or common identifying sign or symbol; (2) one of the group's primary activities is the commission of one of the specified predicate offenses; and (3) the group's members "engage in or have engaged in a pattern of criminal gang activity."  People v. Gardeley, 14 Cal.4th 605, 616-617 (1996).  The term "pattern of criminal gang activity" is defined in § 186.22(e) as "the commission, attempted commission, or solicitation of two or more of [the statutorily enumerated 'predicate offenses'] . . ."  Section 186.22(e) then lists the specific offenses that qualify as predicate offenses.  Sale, possession, and offer for sale of controlled substances are included as predicate offenses.  See Cal. Pen. Code § 186.22(e).

These requirements are not unconstitutionally vague and overbroad.  What makes § 186.22's definition of a criminal street gang sufficiently narrow so as not to include most organizations and associations in the United States *is the requirement that one of the group's primary activities be the commission of crime*.  See People v. Gamez,  235 Cal.App.3d 957, 971 (1991), *disapproved on other grounds in* Gardeley, 14 Cal.4th at 624 n.10.  The statute does not criminalize membership in a group per se; rather, it criminalizes the *active participation* in a criminal street gang by one who devotes a substantial part of his time and effort to the gang's *illegal activities*.  Id. at 972; People v. Green, 227 Cal.App.3d 692, 700 (1991).

### b.  Section 12022.53.

Section 12022.53 provides for an enhancement and consecutive term of 25–years–to–life in state prison if, in the commission of a murder, a person "personally and intentionally discharges a firearm and proximately causes ... death, to any person other than an accomplice."  See Cal.Penal Code §§ 12022.53(a)(1), (d). Section 12022.53 also provides for a consecutive term of 25–years–to–life in state prison for defendants who are convicted of aiding and abetting a murder committed for the benefit of a criminal street gang (i.e., in violation of Cal.Penal Code § 186.22(b)) where "[a]ny principal in the offense" "personally and intentionally discharge[d] a firearm and proximately cause[d] ... death, to any person other than an accomplice."  Cal.Penal Code §§ 31, 12022.53(d), (e) (emphasis added); People v. Hernandez, 134 Cal.App.4th at 480 & nn. 35–36 (citations omitted).

26

Under this sentencing regime, an aider and abettor who is found guilty of murder is subject to the 25-years to life enhancement even though he or she did not personally and intentionally discharge a firearm causing death if the murder was committed for the benefit of a criminal street gang and "any principal" in the offense personally and intentionally discharged a firearm causing death.[ ] In all other killings subject to section 12022.53, subdivision (d)—that is, killings not for the benefit of a criminal street gang—a principal, including an aider and abettor, is only subject to the 25–year enhancement if he or she personally and intentionally discharged a firearm causing death.  People v. Hernandez, 134 Cal.App.4th at 480.

In 1988 when it enacted legislation to address gang violence, the California Legislature found that "violent street gangs ... present a clear and present danger to public order and safety and are not constitutionally protected." Cal.Penal Code § 186.21; see also People v. Hernandez, 134 Cal.App.4th at 481, 36 Cal.Rptr.3d 59 ("It is beyond dispute the state [of California] has a legitimate interest in suppressing criminal street gangs."). Ten years later, when it enacted § 12022.53, the California legislature again recognized "the serious threats posed to the citizens of California by gang members using firearms." People v. Garcia, 28 Cal.4th 1166, 1172, 124 Cal.Rptr.2d 464, 52 P.3d 648 (2002) ("The legislative intent behind section 12022.53 is clear: 'The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime.' ") (citation omitted), denial of habeas corpus aff'd, Garcia v. Yarborough, 310 Fed. Appx. 988 (9th Cir.), cert. denied, ––– U.S. ––––, 130 S.Ct. 84, 175 L.Ed.2d 58 (2009).

c. Discussion.

Having concluded that, in general, neither statute is unconstitutionally vague, the only remaining issue is whether the two statutes are so confusing and difficult to apply that they fail to give fair notice to defendants regarding the potential sentences that could be imposed.  Again, this contention is without merit.

U.S. v. Batchelder, 442 U.S. 114, 99 S.Ct. 2198 (1979), cited by Respondent is dispositive of Petitioner's contention.  In Batchelder, when rejecting the defendant's contention that the combination

27

of the two enhancements somehow created an ambiguity that violated the vagueness doctrine, the

Supreme Court stated:

> The provisions in issue here, however, unambiguously specify the activity proscribed and the penalties available upon conviction. See supra, at 2201–2202. That this particular conduct may violate both Titles does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.

Batchelder, 442 U.S. at 123.

The same reasoning applies to Petitioner's argument in this case.  The California Supreme

Court could have reasonably concluded that § 186.22(b) provided for a 15-year-to-life sentence if

convicted.  Likewise, the state court could have reasonably concluded that § 12022.53(e) provided for

an additional ten-year enhancement.  Because both statutes could reasonably be considered clear about

the individual sentences mandated by each statute separately, the fact that California law permits both

statutes to be applied to a single defendant does not inherently make the combined sentence

unconstitutionally vague.  To the contrary, as the Supreme Court noted in Batchelder, where both

statutes are clear when considered separately, no constitutional infirmity arises just because the two

statutes are applied together.  Batchelder, 442 U.S. at 123. The fact that lawyers and even judges may

on occasion have difficult applying those sentencing laws correctly does not mean that those statutes

are inherently vague and unconstitutional.

Accordingly, the state court adjudication was neither contrary to nor an unreasonable

application of clearly established federal law.  Hence, Petitioner's claim must be rejected.

D.  Sufficiency of the Evidence.

Next, Petitioner contends that insufficient evidence was presented to support the criminal street

gang enhancement.  Again, the Court disagrees.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner claim as follows:

A. Facts

It was stipulated that on June 14, the Bloods were an ongoing criminal street gang operating in Bakersfield within the meaning of section 186.22, subdivision (b)(1). Officer Herman testified that Bloods typically wear articles of red clothing. Epperson is a known Blood member. On two occasions in 2004, appellant was stopped by police while riding in a dark blue Ford LTD driven by Epperson. On three separate occasions when booked into jail, appellant requested housing with Blood members. Herman reviewed 11 transcripts of phone calls appellant made from the Kern County Jail while awaiting trial. During these calls, appellant made numerous gang-related references. Based on the foregoing, Herman opined that appellant and Epperson were active Blood members on June 14.

Herman has investigated approximately 50 drive-by shootings. "[A]lmost all of them" have been gang related. In his opinion, drive-by shootings are done in furtherance of and for the benefit of street gangs. Drive-by shootings elevate the status of the participants within the gang by demonstrating a willingness to commit crimes. Furthermore, the gang benefits from a drive-by shooting because it intimidates rival gangs and citizens. A drive-by shooting demonstrates that the gang is willing to engage in violent and aggressive behavior, thereby increasing fear of the gang.

B. There is sufficient proof that this drive-by shooting was committed in furtherance of and for the benefit of the Bloods.

Appellant argues the People failed to prove that this particular drive-by shooting was gang related because Herman only testified that in general drive-by shootings are gang related. Not so.

The applicable standard of appellate review is undisputed. When assessing the sufficiency of the evidence, a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (People v. Hawkins (1995) 10 Cal.4th 920, 955.) "The California Supreme Court has held, 'Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citations.]" (People v. Gaut (2002) 95 Cal.App.4th 1425, 1430.) The reviewing court presumes in support of the judgment the existence of every fact the trier reasonably could deduce from the evidence, including reasonable inferences based on the evidence. (People v. Tran (1996) 47 Cal .App.4th 759, 771-772.) We do not reweigh evidence or determine if other inferences more favorable to the defendant could have been drawn from it. (People v. Stanley (1995) 10 Cal.4th 764, 793.)

In this case, a jury reasonably could infer that this particular drive-by shooting was committed in furtherance of and for the benefit of the Bloods from testimony establishing the following: (1) appellant and Epperson were Bloods; (2) the color red is associated with the Bloods and appellant was wearing a shirt that was partially red when he participated in the crime; (3) Epperson drove by in the LTD immediately before the shooting started; (4) drive-by shootings elevate the status of the participants within the gang; (5) drive-by shootings benefit the gang by enhancing fear of the gang and by intimidating rivals and citizens; and (6) almost all of the 50 drive-by shootings Herman has investigated were gang related. Since appellant was a Blood and was wearing clothing featuring a Blood-associated color (red) when he participated in the drive-by shooting, one could reasonably infer that this drive-by shooting was intended to enhance the Bloods' reputation for violence. Because Epperson, who is a fellow Blood, drove by immediately before the shooting began, one could also reasonably infer the shooting was intended to enhance appellant's status within the gang by demonstrating his willingness to participate in violent crimes.

(LD 5, pp. 14-16).

                2.  Federal Standard.

        The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

        A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'"  See id., quoting Jackson, 443 U.S. at 319.  Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

        If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations.  See id. at 957-958.

        Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of aiding and abetting).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.[1]

Moreover, in applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 at 3 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

---

[1] Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

"Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [4]

3.  Analysis.

Here, the 5th DCA found sufficient evidence for the street gang enhancement, citing to a state case, i.e., People v. Hawkins, which, in turn applies the Jackson standard.  (LD 5, p. 15).  Accordingly, the state court applied the correct "clearly established federal law."  Thus, the only issue is whether that application was objectively unreasonable.  The Court concludes that it was not.

The 5th DCA clearly set forth the evidence supporting the gang enhancement:

(1) appellant and Epperson were Bloods; (2) the color red is associated with the Bloods and appellant was wearing a shirt that was partially red when he participated in the crime; (3) Epperson drove by in the LTD immediately before the shooting started; (4) drive-by shootings elevate the status of the participants within the gang; (5) drive-by shootings benefit the gang by enhancing fear of the gang and by intimidating rivals and citizens; and (6) almost all of the 50 drive-by shootings Herman has investigated were gang related. Since appellant was a Blood and was wearing clothing featuring a Blood-associated color (red) when he participated in the drive-by shooting, one could reasonably infer that this drive-by shooting was intended to enhance the Bloods' reputation for violence. Because Epperson, who is a fellow Blood, drove by immediately before the shooting began, one could also reasonably infer the shooting was intended to enhance appellant's status within the gang by demonstrating his willingness to participate in violent crimes.

(LD 5, p. 16).  Moreover, as the state court pointed out, the parties had stipulated that the Bloods were a criminal street gang.

The only issue for this Court, therefore, is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S., at 319, 99 S.Ct. 2781.  Given this

---

[4] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980). Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

persuasive body of evidence, it is frivolous to suggest that no rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt.  Accordingly, the state court's adjudication was neither contrary to nor an unreasonable application of clearly established federal law.

     E.  Photographic Lineup.

     Petitioner also contends that the photographic lineup was unduly suggestive.  Petitioner is mistaken.

          1.  The 5th DCA's Opinion.

     The 5th DCA rejected Petitioner's claim as follows:

     A. Facts

Appellant moved in limine to suppress evidence of the photographic lineup in which he was selected by Jackson (lineup number 5248), arguing this lineup was impermissibly suggestive because he was depicted wearing the same shirt that he wore during the in-field identification and he was the only person who was wearing a shirt with any red on it.

Officer Herman testified at the in limine hearing. He stated that lineup number 5248 consists of six photographs. Appellant's photograph is in position number three. Herman created this lineup by accessing the county's Picture Link System, which is a database of photographs of individuals who have been arrested. He selected appellant and then entered a set of criteria into the program. The criterion consists of race, gender, height, weight, facial hair and age. Clothing is not one of the criteria. The computer program selected five similar individuals based on the criteria. Herman had two photographs of appellant from which to choose: a photograph that was taken on the night he was arrested in connection with the drive-by shooting and a photograph that was taken a few years earlier. Appellant had a shaved head or extremely short hair in the older photograph. Since Jackson had stated that the suspect had an afro hairstyle, Herman selected the more recent photograph; his decision had nothing to do with the shirt appellant was wearing. When Herman selected this photograph he did not know that appellant wore this shirt when Jackson identified him shortly after the shooting. When Herman showed this lineup to Jackson, she pointed to the picture of appellant and said, "he was one of the guys in the gray car." She did not refer to appellant's clothing. Before Herman showed Jackson the lineup, he gave her the standard "lineup admonition."

Appellant is the only individual in the photo lineup wearing a shirt that has any red in it. The court described appellant's shirt for the record, as follows: "It is not pure red.... [¶] It is a shirt that has the red collar, has red in it, but, it is also white, and ... looks like it has a black stripe going across the chest, and also black stripes going across the shoulders, but [ ] it does not appear to be a distinctive shirt."

The motion was denied. The court carefully explained the basis for this ruling. First, it determined that the compilation process was fair, explaining:

     "I'm well satisfied from the evidence that I received here in court today, that the compilation process was, indeed, fair.

     "And, in particular, I have no quarrel with the officer's decision to go with the booking photograph in the current case, as opposed to an earlier case, given the considerable

difference in hair style."

Next, the court concluded that the lineup was not suggestive, explaining:

"In this particular case, as I look at these six photographs, 3 and 6 depict individuals who have the same facial style.

"They are both looking down.

"1 and 3 have the afros.

"All seem to have some facial hair, even though the lineup search criteria asks for no facial hair. [¶] ...

"But I'm looking at it, and a couple of these people, Numbers 2 and 4, don't look like anybody else, but clearly to me, as I'm looking at this, I'm looking at photos 1, 3, 5 and 6, and particularly 3 and 6, and I'm saying, this is a pretty fair lineup. [¶] ...

"... [W]hen I take a look at it, these are really much better photographs than the ones I used to see in the old days, because ... I can almost draw a horizontal line, right across each of these and the eyes lineup, the chins lineup, just about everything lines up, so that, when you are looking at these, it's not highlighting any one portion of the individual's face, chin, shoulders, from another.

"It's really a good, fair depiction."

At trial, Jackson positively identified appellant as the passenger in the gray car. She said, "I know that for a fact that he was in the passenger's seat." Later, the prosecutor asked her, "[W]hen you sit here today, are you certain that the individual that is seated over here, [appellant], is the same individual that you saw in the gray car on the night of the shooting?" Jackson responded, "Yes, I am." Jackson testified that when she identified appellant in the photo lineup, she said to Herman, "[T]hat's him, because, he had his hair like that with a red and white shirt on."

B. The lineup was not unfairly suggestive.

Appellant reiterates on appeal his argument that the lineup was unfairly suggestive because he was depicted wearing the same shirt he wore during the field show-up. Also, he is the only person in the lineup wearing a shirt with red on it and when Jackson testified she listed his red and white shirt as one of the characteristics that led her to select his photo. We are not convinced.

The United States Supreme Court established the applicable test: "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Simmons v. United States (1968) 390 U.S. 377, 384.) "Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable. [Citations.]" (People v. Yeoman (2003) 31 Cal.4th 93, 123.) The court must determine whether the identification procedure was suggestive and, if so, whether the identification was nonetheless reliable under the totality of the circumstances. (People v. Gordon (1990) 50 Cal.3d 1223, 1242.) The defendant bears the burden of showing that the identification procedure resulted in such unfairness that it abridged his due process right. (People v. Brandon (1995) 32 Cal.App.4th

34

1033, 1051.)

"'It is unsettled whether suggestiveness is a question of fact (or a predominantly factual mixed question) and, as such, subject to deferential review on appeal, or a question of law (or a predominately legal mixed question) and, as such, subject to review de novo.'" (People v. Johnson (1992) 3 Cal.4th 1183, 1216.)

In People v. Floyd (1970) 1 Cal.3d 694, our Supreme Court concluded that it is not unfairly suggestive to require a suspect to participate in a lineup wearing the clothes in which he was arrested, even though the witness remembered the suspect's pants "more than anything else about him." (Id. at p. 714.) Our high court explained that "no authority [supported] the proposition that it is a denial of due process to require a suspect to wear the clothes in which he was arrested." (Id. at p. 713.) The police are not obligated "to match the outfits of everyone in the lineup anymore than the police were required to match the physical proportions of the other men with scientific exactitude." (Ibid.)

Our Supreme Court also has rejected claims that a lineup was unfairly suggestive because the defendant was wearing a particular article of clothing that was similar to an article of clothing described by the witness. In People v. DeSantis (1992) 2 Cal.4th 1198, defendant challenged a lineup because he was wearing a red or orange shirt and the witness remembered the suspect as wearing a red jacket. The high court characterized defendant's shirt as "hardly uncommon apparel" that "cannot be termed a badge of identity here." (Id. at p. 1222.) And in People v. Johnson (1992) 3 Cal.4th 1183, the fact defendant was the only person in the lineup pictured wearing jail clothing was held not to render a photo lineup unfairly suggestive. (Id. at pp. 1217-1218 .)

We do not believe Jackson's testimony that she selected appellant's photo in part because of his red and white shirt compels a different result than that reached in Floyd, DeSantis and Johnson. Appellant does not contend his appearance was distinctive in any other respect and we do not believe this single article of clothing is sufficiently unusual to render the lineup unfairly suggestive. "[T]here is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance." (People v. Brandon, supra, 32 Cal.App.4th at p. 1052.)

C. Jackson's identification of appellant was reliable.

Additionally, the totality of the circumstances establishes the reliability of Jackson's identification. (People v. Cunningham (2001) 25 Cal.4th 926, 989-990.) Jackson identified appellant on occasions other than the contested photo lineup. She identified appellant as one of the occupants of the gray car in a field show-up shortly after the shooting. She positively identified appellant at trial, testifying that she was certain he was the passenger in the gray car. Her trial identification was not based on the photographic lineup but upon her independent recollection. Also, before Jackson viewed the photographic lineup she was given the standard admonition instructing her that she was not to assume the person who committed the crime was pictured and that she did not have any obligation to identify anyone.

(LD 5, pp. 10-14).

### 2. Federal Standard.

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."

Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314, 326, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (discussing retroactivity of rules propounded by Supreme Court). To determine the admissibility of identification testimony, courts employ a two-step analysis. United States v. Love, 746 F.2d 477, 478 (9th Cir.1984).

The first step focuses on whether the identification procedure was impermissibly suggestive. Id. (citing Manson v. Brathwaite, 432 U.S. 98, 107, 97 S.Ct. 2243 (1977); Neil v. Biggers, 409 U.S. 188, 199–200, 93 S.Ct. 375 (1972)). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. Biggers, 409 U.S. at 198. An identification procedure is suggestive where it "[i]n effect ... sa[ys] to the witness, 'This is the man.'" Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127 (1969). Each case must be considered on its own facts, and whether due process was violated depends on the totality of the circumstances surrounding the confrontation. Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967 (1968); see also Stovall, 388 U.S. at 302. If the court finds that a challenged procedure is not impermissibly suggestive, the due process inquiry ends. United States v. Bagley, 772 F.2d 482, 493 (9th Cir.1985) ("Having concluded that the ... show-up was a legitimate identification procedure, we need not reach the question whether the [witness's] identification was reliable under the test enunciated in Biggers." ).

If the identification procedure was impermissibly suggestive, a reviewing court proceeds to the second step and determines whether, under the totality of the circumstances, an identification that resulted from it was nevertheless reliable. Biggers, 409 U.S. at 198. Factors to be considered in evaluating the reliability of an identification after a suggestive procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention paid to the criminal; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the confrontation; and (5) the length of time between the crime and the confrontation. Id. at 199–200; Torres v. City of Los Angeles, 548 F.3d 1197, 1209 (9th Cir.2008).

3. Analysis.

The instant petition does not explain precisely why Petitioner believes that the photo line-up

was unlawfully suggestive.  However, in his direct appeal in state court, Petitioner contended that, in the line-up photo used for Petitioner, he was wearing the same shirt he wore in the field show-up and that his shirt was the only one in the photo line-up that was red.  (LD 5, p. 10).

Petitioner's contention that his lineup was unduly suggestive because he wore the same shirt at the field show-up and was the only red shirt in the line-up is entirely unpersuasive. The Ninth Circuit has consistently declined to hold that minor differences between suspects' photographs render a lineup impermissibly suggestive.  In Mitchell v. Goldsmith, 878 F.2d 319, 323 (9th Cir.1989), the Ninth Circuit rejected a habeas petitioner's claim that pretrial identification procedures were unduly suggestive where he was "the only person in the lineup who was photographed against a blue background; four of the seven individuals in the photographic lineup had lighter complexions than his; and [his] photo was the only photo with a 1981 date."  Likewise, in United States v. Collins, 559 F.2d 561, 563 (9th Cir.1977), the court rejected the same argument where the petitioner claimed that "(1) three of the six Negro male individuals depicted appeared to be significantly younger than [the petitioner]; (2) only [the petitioner] and two others appear to have afro-style haircuts; and (3) only [the petitioner] appears to have a beard."  See also United States v. Burdeau, 168 F.3d 352, 357 (9th Cir.1999) (finding photo array not suggestive where defendant's picture "was placed in the center of the array, was darker than the rest, and was the only one in which the eyes were closed," and citing cases for proposition that "such insubstantial differences ... do not in themselves create an impermissible suggestion that the defendant is the offender"); United States v. Johnson, 820 F.2d 1065, 1073 (9th Cir.1987) (holding photographic array not unduly suggestive where defendant's photograph was hazier than others); United States v. Sambrano, 505 F.2d 284, 286 (9th Cir.1974) (determining photographic array not unduly suggestive where defendant's photograph was darker and clearer than others); United States v. Lincoln, 494 F.2d 833, 839 (9th Cir.1974) (finding photographic array not unduly suggestive where defendant's color driver's license photograph was shown with black and white copies of driver's licenses or other types of photos).

Here, the Court of Appeal reviewed the photographs as well as the trial court's consideration of the line-up before rejecting Petitioner's claim.  The 5th DCA acknowledged that the witness, Jackson,

had indicated at trial that one factor in her identification of Petitioner was the red and white shirt he was wearing.  However, the state court noted that Jackson had previously identified Petitioner at the field show-up and again, in a positive identification at trial.  Based on that, the state court concluded that Jackson's identification of Petitioner was reliable.

Petitioner is able to point to only minor and superficial differences between his photo and those of the other individuals in the line-up.  This is insufficient, as indicated by the controlling cases cited above.  Since the challenged procedure for the photographic line-up was not impermissibly suggestive, the due process inquiry ends. Bagley, 772 F.2d at 493. The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law, and therefore Petitioner is not entitled to relief on this claim.

F.  Ineffective Assistance of Trial Counsel.

Next, Petitioner argues that he was denied the effective assistance of trial counsel whom, Petitioner contends, improperly advised him regarding the penal consequences of his crimes.  Again, the claim lacks merit.  Because the claim was summarily denied by the state supreme court without a reasoned decision, the Court will review the claim based on an independent review of the record.

1.  Federal Standard.

The same federal standard applies for ineffective assistance of trial and appellate counsel. Smith v. Robbins, 528 U.S. at 285; Smith v. Murray, 477 U.S. 527.  Since the Court has previously discussed the federal standard at length, it will not be repeated again in this section.

2.  Analysis.

Petitioner argues that trial counsel failed to adequately develop that state record and erroneously advised Petitioner that the maximum sentence he could receive was 17 years.  (Doc. 1, p. 7).  However, Petitioner fails to satisfy either prong of Strickland.

First, Petitioner has failed to show that counsel's performance was deficient.  As Respondent correctly observes, on multiple occasions during trial Petitioner was advised that his maximum exposure was fifteen-years-to-life (two occasions), or, alternatively, 25-years-to-life (two occasions). (LD 23, 11-12; LD 24, pp. 407; 447; 528).  Since Petitioner was ultimately sentenced to 15-years-to-

1   life, he cannot be heard to complain that counsel's advice regarding his maximum exposure was

2   erroneous or misleading.  The record simply does not support Petitioner's assertion that trial counsel

3   provided erroneous sentencing advice.

4        Second, Petitioner has failed to show prejudice.  More specifically, he has not even alleged, let

5   alone shown, that, *but for* counsel's purportedly erroneous sentencing advice, Petitioner would have

6   accepted the five-year plea bargain he was repeatedly offered and repeatedly rejected.  To the

7   contrary, Petitioner has indicated on multiple occasions that the reason he rejected the five-year plea

8   bargain because he wanted to fight the charges against him.  (LD 25, pp. 632; 637-639; 643-644).

9   Whether this was out of a belief that he was actually innocent or simply a misguided calculation that

10  he would not be found guilty is unclear.  However, without some evidence that Petitioner would have

11  accepted the five-year plea bargain had he been advised "correctly" by trial counsel, Petitioner has not

12  shown prejudice.

13       Having failed to establish either prong of the Strickland test, Petitioner has likewise failed to

14  show that the state court adjudication rejecting his claim was objectively unreasonable.

15       G.  Judicial Bias.

16       Finally, Petitioner maintains that the state court was biased and, as a consequence, erroneously

17  affirmed the trial court's sentence, thereby misapplying the State's sentencing laws.  (LD 12, pp. 14-

18  16).  The Court disagrees.  Because this claim was not addressed in a reasoned decision, the Court will

19  review the record independently.

20            1.  Federal Standard.

21       The Supreme Court has recognized that "the right to an impartial judge [is] among those

22  'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless

23  error.'"  Greenway v. Schriro, 653 F.3d 790, 805 (9th Cir.2011) (quoting Chapman v. California, 386

24  U.S. 18, 23, 87 S.Ct. 824 (1967)).  Where judicial bias is claimed, habeas relief is limited to

25  circumstances in which the state trial judge's behavior rendered the trial so fundamentally unfair as to

26  violate due process.  See Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir.1995). To succeed on a judicial

27  bias claim, a habeas petitioner must "overcome a presumption of honesty and integrity in those serving

28

1   as adjudicators." <u>Withrow v. Larkin</u>, 421 U.S. 35, 47, 95 S.Ct. 1456 (1975); <u>Larson v. Palmateer</u>, 515

2   F.3d 1057, 1067 (9th Cir.2008). "In the absence of evidence of some extrajudicial source of bias or

3   partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the

4   presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile

5   to, counsel, the parties, or their cases.'" <u>Larsen</u>, 515 F.3d at 1067, quoting <u>Liteky v. United States</u>,

6   510 U.S. 540, 555, 114 S.Ct. 1147 (1994).

7           2.  <u>Analysis</u>.

8         In essence, Petitioner reiterates arguments made elsewhere regarding the validity of his

9   sentence under Pen. Code § 12022.53, which, Petitioner maintains, was never intended to apply to an

10  individual who does not actually use a weapon.  (LD 12, p. 16).  From this observation, Petitioner

11  jumps to the conclusion that the 5th DCA panel's decision showed judicial bias.  Apart from

12  Petitioner's mere disagreement with the 5th DCA's interpretation of § 12022.53, however, Petitioner

13  has provided no specific allegations, let alone specific proof, that would tend to establish that

14  Petitioner was the target of judicial bias in the 5th DCA's opinion.  As mentioned above, adverse

15  rulings alone do not establish judicial bias "in the absence of evidence of some extrajudicial source of

16  bias or partiality." <u>Larsen</u>, 515 F.3d at 1067.  Since Petitioner has not proffered any evidence of some

17  extrajudicial source of bias, his claim must necessarily fail upon independent review of the record.

18                                  **RECOMMENDATION**

19        Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

20  (Doc. 1), be DENIED with prejudice.

21        This Findings and Recommendation is submitted to the United States District Court Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

23  Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-

24  one (21) days after being served with a copy of this Findings and Recommendation, any party may file

25  written objections with the Court and serve a copy on all parties.  Such a document should be

26  captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

27  Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after

28

service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 11, 2013**                    **/s/ Jennifer L. Thurston**
                                                   UNITED STATES MAGISTRATE JUDGE